**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| STEWART LIFF, *et al.*,<br><br>　　　**Plaintiffs,**<br><br>　　　　**v.**<br><br>OFFICE OF THE INSPECTOR<br>GENERAL FOR THE U.S.<br>DEPARTMENT OF LABOR, *et al.*,<br><br>　　　**Defendants.** | Civil Action No.  14-1162 (JEB) |

## MEMORANDUM OPINION

Plaintiff Stewart Liff, an experienced consultant in public-sector human-resources management, says he and his eponymous firm, Stewart Liff & Associates, have been wrongfully impugned by several arms of the federal government.  Both thus sued the U.S. Department of Labor, its Office of Inspector General, the Office of Personnel Management, and several DOL and OPM officers.  They allege that Defendants violated both the Fifth Amendment and the Administrative Procedure Act by falsely suggesting, in public statements and documents, that Plaintiffs lacked integrity and good character, and that those statements broadly curtailed their ability to secure government contracts.  Defendants now move to dismiss, identifying a series of impediments that they maintain blocks this suit.  As most are not insuperable at this stage, the Court will largely deny the Motion and permit the case to proceed to discovery.

## I.　　Background

According to the Complaint, which the Court must accept as true in evaluating Defendants' Motion, Liff is a seasoned HR executive, having worked for several decades in senior positions within the U.S. Departments of Defense and Veterans Affairs.  <u>See</u> Compl.,

¶ 11.  Upon retiring from civil service, Liff turned to government consulting, building a book of business consisting mostly of federal-agency clients.  See id., ¶¶ 15-18.

A.  Plaintiff's Government Contracts

After the inauguration of President Obama in 2009, Liff reached out to a member of the administration's transition team for the Department of Veterans Affairs to promote his skills and suggest reforms for the agency.  See id., ¶ 19.  The individual he contacted, Ray Jefferson, did not end up serving in the VA but was appointed instead as Assistant Secretary for DOL's Veterans' Employment and Training Service (DOL-VETS), which provides job training and other employment-related resources for returning service members.  See id., ¶ 20.  Convinced that Liff could be of assistance to DOL-VETS, Jefferson arranged for him to be hired "as a subcontractor under an existing contract" to that office, working with several individuals in DOL-VETS' Office of Agency Management and Budget to make that happen.  See id., ¶ 21.

Beginning in late 2009, Liff began a series of consultancies for DOL-VETS, working as a subcontractor to three different prime contractors.  From November 2009 to March 2010, he worked under a subcontract with For Your Information, Inc., and from April 2010 to August 2010, he subcontracted with MSTI, Inc.; both companies held contracts directly with DOL-VETS.  See id., ¶¶ 22-23.  From September 2010 to December 2010, he provided consulting services to DOL-VETS through a contract that a company named Information Experts, Inc., held with OPM.  See id., ¶ 24.  DOL-VETS was able to obtain Liff's services under that contract by establishing an interagency agreement with OPM in which DOL-VETS could reimburse OPM for using the latter's contract vehicle.  See id.

In March 2011, Liff's work under the Information Experts contract expanded beyond his DOL-VETS client to include direct work for OPM.  See id., ¶ 36.  Under the terms of his

contract with Information Experts, he was to be paid for performing discrete, fixed-price task orders.  See id., ¶¶ 36-37.  Liff claims that his work was going swimmingly when, in August 2011, OPM abruptly "terminat[ed] the task order under which Liff was providing human resources management consulting . . . to OPM."  Id., ¶ 47.

  B.  DOL-OIG Investigation

  At least a month before the task order was terminated, however, there were signs that all was not well from the government's perspective with Liff's contracts.  In July 2011, after conducting an eight-month investigation, the Department of Labor's Office of Inspector General (DOL-OIG) issued a final report concluding that certain contracting improprieties had taken place at DOL-VETS during Jefferson's tenure.  See id., ¶¶ 34, 35, 38.  The primary focus of the investigation was whether Jefferson and other agency officials had improperly circumvented federal procurement laws in retaining Liff's services.  See id., ¶ 38.  The report concluded that Jefferson and other officials had in fact acted in such a way that "reflect[ed] a consistent disregard of federal procurement rules and regulations, federal ethics principles, and the proper stewardship of appropriated dollars."  Id., ¶ 38; see also DOL-OIG Report No. 14-1301-0002 IA ("DOL-OIG Report"), Cover Memorandum at 1.[1]  The primary basis for this conclusion, says Liff, is that Jefferson and his colleagues purportedly pressured certain procurement officials in DOL-VETS to hire Liff, regardless of whether that meant disregarding strict procurement policies.  See Compl., ¶ 38.  Even though Plaintiffs agree that the main purpose of the report was

---

[1] Available at: https://www.oig.dol.gov/public/reports/DOL_OIG_VETS_Investigative_Report.pdf.  Defendants supplied a copy of the DOL-OIG report, albeit without including the cover memorandum, as Exhibit B to their Motion.  As both the report and its cover memorandum are public government documents, the Court may consider them without converting Defendant's Motion to Dismiss into one for summary judgment. See E.E.O.C. v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997); Detroit Int'l Bridge Co. v. Gov't of Canada, No. 10-476, 2015 WL 5726601, at *6 (D.D.C. Sept. 30, 2015).

to expose procurement improprieties originating from <u>government</u> officials, including Jefferson, they contend that "Liff and his consulting services were the central focus of the [report]," <u>id.</u>, and that it "contained numerous blatant misstatements and false characterizations specifically regarding Liff" that cast doubt on his honesty and integrity.  <u>See id.</u>, ¶¶ 42-43.

In Plaintiffs' view, the retaliatory motivations of certain DOL-VETS employees have undermined the legitimacy of the entire investigation.  They allege that it came about because several disgruntled DOL-VETS employees were displeased with certain reforms he had proposed to senior officers, like Jefferson, within the agency.  <u>See id.</u>, ¶¶ 33-34.  Liff acknowledges that he had been "highly critical" of the agency's budget office in various assessment reports he submitted to the agency, and he asserts that the office's deputy director, Angela Freeman, and another budget-office employee, Paul Briggs, struck back against Liff and Jefferson by lodging complaints with DOL-OIG.  <u>See id.</u>, ¶¶ 32-33, 41.

Whatever the reasons for its initiation, the investigation went forward under the auspices of Acting Inspector General Daniel Petrole, <u>id.</u>, ¶ 5, who directed two of his subordinates to interview Liff as a "witness."  <u>Id.</u>, ¶¶ 78-79.  Liff cooperated, <u>id.</u>, ¶ 78, but insists that no one from DOL-OIG notified him that the investigation might yield a final report that reflected poorly on his reputation, or that other witnesses – like Freeman, Briggs, or perhaps even their union representatives – had already provided "false and vindictive accusations and characterizations of [Liff's] work at DOL-VETS."  <u>Id.</u>, ¶ 35; <u>see id.</u>, ¶ 78.  After reviewing the DOL-OIG Report upon its release in July 2011, Liff was displeased that the report repeated at least Freeman's assertions without indicating that she "was a person of highly suspect credibility with a strong bias to malign both . . . Jefferson and Liff."  <u>Id.</u>, ¶ 41.

Accompanying the report's release was a cover memorandum from Petrole to Seth Harris, then-Deputy Secretary of DOL, that summarized (inaccurately, says Liff) the contents of the report.  See id., ¶ 38.  The memorandum recommended that DOL take certain follow-up actions, including "review[ing]" the specific procurements identified in the DOL-OIG Report and "determin[ing] what, if any, further actions should be taken."  Cover Memo. at 3.

On July 27, 2011, "DOL and DOL-OIG convened a joint press conference, announcing the findings and conclusions in the DOL-OIG report" and thus, according to Liff, repeating the report's "false depictions of Liff."  Compl., ¶ 45.  The press conference spawned a Washington Post article that "asserted that Liff had received approximately $700,000 . . . for services that could have been secured at a much lower cost through open competition" and noted that his work included giving "advice on the 'proper color scheme' for offices" at DOL-VETS, thus casting substantial doubt on whether the government had obtained good value for his services.  See id.

At the end of August 2011, Deputy Secretary Harris released a follow-up memorandum to the July 2011 DOL-OIG Report.  See id., ¶ 48.  Liff contends that such memorandum "ratified" the DOL-OIG Report's inaccurate findings by "praising DOL-OIG for its report and setting forth concrete follow-up actions . . . relat[ing] to Liff."  Id.  Specifically, Harris stated in the memo that DOL would "'aggressively pursue' Liff for 'all valid causes of action' under, inter alia, the False Claims Act."  Id.

According to the Complaint, the investigation, report, press conference, and responsive memorandum are concrete acts taken by DOL and DOL-OIG that had an adverse effect on Plaintiffs.  As a result, Liff claims, he lost a "prized" invitation to speak at an annual conference where numerous high-level federal officials – and presumably prospective clients – would be present.  Id., ¶ 51.  The National Labor Relations Board also rescinded an offer for Plaintiff to

teach a seminar on how to manage federal employees.  Id.  And the Los Angeles Federal Executive Board revoked its invitation for Liff to speak at one of its events.  Id.

He also states that "most" of his consulting work had previously originated with government officials' reaching out to him directly by way of his website, but that all inquiries effectively dried up in the aftermath of the government's damaging statements about him.  Id., ¶ 52.  Former federal-agency clients stopped doing business with him, including several branches of the Department of Veterans Affairs in California.  Id., ¶ 53.  Finally, Liff claims that the report and DOL memorandum caused a significant decline in his federal contracting work.  Specifically, he notes that he

> ha[d] submitted competitive bids on a variety of government contracts since the issuance of the DOL-OIG report, but with one exception, [was not] selected for any project.  Government contractors that had expressed strong interest in teaming up with Liff later refused to partner with him because of the adverse publicity from the DOL-OIG report.

Id., ¶ 52.  Liff does not, however, identify which agencies received his bids or which one ultimately decided to do business with him.

C.  OPM Investigation

DOL's and DOL-OIG's actions also triggered a collateral investigation by OPM's inspector general in late July 2011.  Around that time, OPM's then-director Berry held a press conference in which he "stated, inter alia, that Liff and/or Stewart Liff & Associates, Inc. would not be used again by OPM for consulting services, a statement reported in a Washington Post article the next day."  Id., ¶ 50.  (The Complaint does not make clear whether the article is the same one that reported on his purportedly overvalued consulting services.)

OPM's Office of Inspector General then set out to inquire "into how Liff's services as a subcontractor to OPM through the existing contract with [Information Experts] had been

arranged." Id., ¶ 47.  And, as previously noted, about a month later in August 2011, "Liff was advised that OPM was terminating the task order under which Liff was providing [HR] management consulting through [Information Experts] to OPM." Id.  The value of that outstanding task order was, according to Liff, $350,000.  See id.

The OPM investigation proceeded similarly to the one conducted by DOL-OIG.  The agency interviewed Liff in March 2012 and issued an interim report on April 2, 2013.  See id., ¶ 49.  Like the DOL-OIG Report, the OPM interim report also suggested "that Liff's services may have been 'wasteful' of taxpayer resources" due to improprieties in how his services were obtained.  See id.  As occurred with the DOL investigation, agency head Berry responded to the report with a publicly issued memorandum.  See id., ¶ 50.  In it, alleges Liff, Berry made clear that, "after the issuance of the DOL-OIG report" in July 2011, "he had taken steps to 'ensure that OPM immediately concluded any business involving [Stewart Liff & Associates, Inc.].'" Id. (quoting OPM's 2013 memorandum).

Although Plaintiffs' revenue stream had already been trending downward ever since July 2011, these "subsequent actions by OPM and Berry," Liff claims, contributed to a sharp, 97% decline in revenue from 2011 to 2013 caused by his "broad[] preclu[sion]" from federal-government contracting.  Id., ¶ 54.

In July 2014, Plaintiffs filed a three-count Complaint against Defendants.  The first, asserted against DOL, DOL-OIG, and OPM, claims that the agencies ruined Plaintiffs' professional reputations and effectively debarred them from government contracting without affording them adequate process guaranteed by the Fifth Amendment.  Count II, pled against individual Defendants Petrole, Harris, Berry, and two unknown agents of DOL-OIG, seeks damages flowing from a Fifth Amendment tort violation under Bivens v. Six Unknown Named

Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971).  Finally, Count III, asserted against the three federal-agency Defendants, alleges that they all violated the Administrative Procedure Act by, *inter alia*, terminating Liff's outstanding task order and constructively debarring him from government-contracting work without affording him any procedural protections.

## II.    Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of an action where a complaint fails "to state a claim upon which relief can be granted."  In evaluating Defendants' Motion to Dismiss, the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (citation omitted); see also Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1250 (D.C. Cir. 2005).  The notice-pleading rules are "not meant to impose a great burden upon a plaintiff," Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005), who must be given every favorable inference that may be drawn from the allegations of fact. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 584 (2007).

Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, id. at 555, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).  Plaintiff must put forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.  The Court need not accept as true "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the Complaint.  Trudeau v. Fed. Trade Comm'n., 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986))

(internal quotation marks omitted).  For a plaintiff to survive a 12(b)(6) motion even if "recovery is very remote and unlikely," moreover, the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555-56 (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

In evaluating the sufficiency of Plaintiffs' Complaint under Rule 12(b)(6), the Court may consider "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice."  EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).  The Court may thus consider those materials on a motion to dismiss without treating the motion "as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d); Marshall v. Honeywell Tech. Solutions, Inc., 536 F. Supp. 2d 59, 65 (D.D.C. 2008).

## III.    Analysis

In moving to dismiss, Defendants argue that all of Plaintiffs' three counts suffer from fatal flaws.  The Court examines each separately, looking first at the Fifth Amendment violation, next considering Bivens, and concluding with the APA.

### A.   Count I (Procedural Due Process)

Plaintiffs first allege that reports and public statements issued by DOL, DOL-OIG, and OPM tarnished their good names and had the effect of both precluding them from contracting with the government and rendering them unable to secure work from private-sector employers. See Compl., ¶¶ 55, 69-73.  These actions, they assert, were taken without giving them adequate notice of the allegations of misconduct and an "opportunity to be heard to meaningfully address" them.  Id., ¶ 67.   In other words, the government failed to give Plaintiffs adequate procedural

protections under the Fifth Amendment's guarantee that "[n]o person shall be . . . deprived of . . . liberty . . . without due process of law."  U.S. Const. Amend. V.

"To state a claim for the denial of procedural due process, a plaintiff must allege that the government deprived her of a '"liberty or property interest" to which she had a "legitimate claim of entitlement," and that "the procedures attendant upon that deprivation were constitutionally [in]sufficient."'"  New Vision Photography Program, Inc. v. Dist. of. Columbia, 54 F. Supp. 3d 12, 28 (D.D.C. 2014) (quoting Roberts v. United States, 741 F.3d 152, 161 (D.C. Cir. 2014) (brackets in original) (quoting Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989)). Plaintiffs' Fifth Amendment due-process claim is premised on the theory that, "'[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him," that person's liberty interest is on the line, meaning that "notice and an opportunity to be heard are essential.'"  Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 573 (1972) (quoting Wisconsin v. Constantineau, 400 U.S. 433, 437 (1971)); see Opp. at 7-8.

The Supreme Court has clarified that the Due Process Clause does not insulate individuals from "defamatory statements by the government alone," but rather protects against such actions only when other, "more tangible interests such as employment" are at stake.  Paul v. Davis, 424 U.S. 693, 701 (1976) (emphases added).  In seeking dismissal of this count, the government offers two defenses – one relating to jurisdiction and the other to the merits.

1.  *FTCA Defense*

Hoping to bypass this constitutional sand trap, the agency Defendants argue that dismissal is warranted because Count I is merely a tort claim for defamation dressed in constitutional garb, and that the Federal Tort Claims Act is thus Plaintiffs' exclusive fairway to relief.  See Mot. at 7.  If so, Plaintiffs' claim must fail because the statute's waiver of sovereign

immunity specifically excepts "[a]ny claim arising out of . . . libel [or] slander." 28 U.S.C.

§ 2680(h).  In addition, because Plaintiffs failed to exhaust their administrative remedies under

the FTCA, the Court lacks subject-matter jurisdiction to entertain the cause of action.  Id. at 8-9.

Tidy as this disposition might be, the argument is premised on Defendants' erroneous

characterization of the due-process claim as, "'in essence[, a] claim[] asserting causes of action

for libel or slander.'"  Id. at 8 (quoting Budik v. Dartmouth-Hitchcock Med. Ctr., 937 F. Supp.

2d 5, 15 (D.D.C. 2013)).  Undoubtedly, had Plaintiffs limited their Complaint to seeking

damages resulting from "defamation by the government . . . alone," Paul, 424 U.S. at 701, the

question would be a closer one.  But the allegations in the Complaint allege more than just

defamation; Plaintiffs assert, for instance, that the government unofficially debarred them from

future contracts.  See Compl., ¶¶ 54, 64, 72.  And they seek more than just monetary relief for

past harms – namely, a wide range of injunctive remedies.  See Compl. at 35-37.  It is thus clear

that Count I cannot be dismissed on the basis that Plaintiffs "in essence" have pleaded a tort

claim for defamation.

### 2.  *Failure to State a Claim*

Moving to the merits, the next question is whether the Complaint plausibly alleges that

the three agencies here, either individually or collectively, have actually cast doubt on Plaintiffs'

"good name[s], reputation[s], honor, or integrity," Roth, 408 U.S. at 573 (quotation marks and

citation omitted), and have worked a "tangible change in [their] status" as a result.  Kartseva v.

Dep't of State, 37 F.3d 1524, 1527 (D.C. Cir. 1994).

### *i.*  Honesty and Integrity

On the first point, Defendants argue that the original, offending DOL-OIG Report "never

concluded that Liff was dishonest, untrustworthy, or lacked integrity," and thus whatever harm

occurred to his reputation is not actionable under Roth and its progeny.  See Opp. at 12-13.

11

Reading the Complaint in the light most favorable to Plaintiffs, however, the Court cannot concur.

While Defendants are correct that many of Plaintiffs' glosses on the DOL-OIG Report are exaggerated – for instance, contrary to the presentation in the Complaint, the Report appears never to have concluded that Liff was "sitting around doing nothing" or that his services included merely "picking wall colors," compare Compl., ¶ 42 with DOL-OIG Report at 19-20 – it is not apparent that the report as a whole could not reasonably be construed to cast a shadow on Liff's honesty and integrity, especially given its decision to include numerous accusations that he had engaged in false-billing practices.  The critical section of the report includes findings relevant to the question of whether "[Assistant Secretary] Jefferson and [Deputy Assistant Secretary] McWilliams abused their authority by giving Stewart Liff an advisory and assistance contract and coercing [DOL-]VETS into manipulating existing federal contracts in order to hire Liff without the benefit of competition."  DOL-OIG Report at 4.  The report is a carefully crafted, edited, and curated presentation of information, all of which, presumably, was selected because it was deemed pertinent in answering that question.

To that end, the report contains numerous statements from interviewees, some hearsay, that, taken together, suggest that Liff was greedy, engaged in unethical and unlawful billing practices, and offered at best nominal value to the government.  As an example, witnesses state or suggest, inter alia, that Liff's services were twice the cost of their commercial value, see id. at 8; that Liff improperly withheld a "'secret' deliverable" from his prime contractor, FYI, Inc., in a way that was "upsetting and inappropriate," id. at 9; that Liff spent less time working on his reports than he did "taking calls from [Jefferson] on unrelated matters" and that he performed tasks "outside the [statement of work]," id.; that he "abused his contractor position because he

would often hang out in VETS with nothing to do and simply bill VETS for the hours," id. at 14;

that "even though Liff was" reputed to be "being paid hundreds of thousands of dollars in airfare,

per diem and salary, Liff would still voucher his metro fare cards which [the interviewee] felt

was appalling," id. 14-15; that the circumstances of Liff's work were analogous to another

"contractor who was paid enormous amounts of money for producing next to nothing," id. at 15;

and, that there was a "problem implementing [Liff's] visual management project because VETS

found out that the colors that Liff wanted the walls to be painted were not possible under General

Services Administration (GSA) regulations." Id. at 19-20.  In sum: the statements, made by third

parties but purposefully included by DOL-OIG in its report, give the unmistakable impression

that Liff had few scruples about acting unethically, unlawfully, dishonestly, and ineffectively.

The government cannot succeed on its Motion simply because it believes its interpretation of the

report is the more sensible one.

To the extent the government contends that it did not endorse certain potentially

defamatory statements, but "merely relayed" them, that is not the case.  The report's authors

gave at least some credence to witnesses in concluding that "Jefferson's insistence upon

retaining the services of [Liff and two other individuals] led to . . . the acceptance of gratuitous

services," and that "the total payment of more than $700,000 to secure Liff's services for a

period of 16 months appears to be excessive."  DOL-OIG Report Cover Memorandum at 1;

DOL-OIG Report at 26.  In addition, DOL's memorandum response appears to signal its

agreement with the report's contents, given that, as a result of the report, DOL decided to

"'aggressively pursue' Liff for 'all valid causes of action' under, inter alia, the False Claims

Act."  Compl., ¶ 48.  Similarly, OPM's memorandum in which it concluded that it had "taken

steps" in 2011 "to 'ensure that OPM immediately concluded any business involving [Stewart

Liff & Associates, Inc.]'" sufficiently suggests that a pall had been cast over Plaintiffs' honesty and integrity.  See id., ¶ 50.  The allegations thus suffice to allow their claim to survive at this stage.

<em>ii.</em>   Tangible Change in Status

Governmental defamation "alone," of course, offends no liberty interest protected by the Due Process Clause.  See Paul, 424 U.S. at 701.  Only if the defamation is accompanied by a stigma resulting in a "tangible change in status" will a plaintiff state a viable Fifth Amendment claim for deprivation of a liberty interest without due process of law.  Kartseva, 37 F.3d at 1527.  In other words, the Due Process Clause protects against "'governmental defamation'" that "potentially constrains [a plaintiff's] future employment opportunities," so long as the government's action also "constitute[s] an adjudication of [the plaintiff's] status under law."  Id. (quoting Siegert v. Gilley, 500 U.S. 226, 233-34 (1991)).

In this Circuit, a "tangible" and thus constitutionally protected change in status may be demonstrated in two ways: by formal disqualification or by broad preclusion.  See Abdelfattah v. U.S. Dep't of Homeland Sec., 787 F.3d 524, 539 (D.C. Cir. 2015).  Under the first, if the relevant agency's "action formally or automatically excludes [Plaintiffs] from work on some category of future [agency] contracts or other government employment opportunities, that action changes [their] formal legal status and thus implicates a liberty interest."  Kartseva, 37 F.3d at 1528.  "Second, if [the agency's] action does not have this binding effect, but nevertheless has the broad effect of largely precluding [Plaintiffs] from pursuing [their] chosen career[s], . . . that, too, would constitute a 'status change' adequate to implicate a liberty interest."  Id.  On its face, the Kartseva standard is sufficiently capacious to preclude dismissal here given the record before the Court, which will now look at the two agencies separately.

14

a.   OPM

Plaintiffs' claim against OPM fits comfortably within the first prong of <u>Kartesva</u>'s status-change test.  In that case, Zhanna Kartseva was employed by a company named Statistica that held language-translation contracts with the U.S. State Department.  <u>Id.</u> at 1525.  After performing Russian-translation work for several months on a particular contract, Statistica was informed by the government that a background check on Kartseva had raised "several significant counterintelligence concerns" and that she was "ineligib[le] for assignment to a [State Department] contract or project."  <u>Id.</u> at 1526 (internal quotation marks and citations to record omitted).  The government "asked Statistica to 'act on'" the government's concerns, and Statistica promptly fired Kartseva.  <u>Id.</u>  Kartseva sued, claiming she was denied adequate process under the Fifth Amendment.  <u>Id.</u> at 1525.

The district court dismissed her suit for failure to state a claim, but the D.C. Circuit reversed, concluding that the "present record" on a motion to dismiss was "cloudy as to the extent of the [government's] disqualification" of Kartseva.  <u>Id.</u> at 1528.  Because the law of the circuit held that "suspension from one government department implicates a liberty interest," <u>id.</u> (citing <u>Reeven Aleutian Airways v. United States</u>, 982 F.2d 594, 598 (D.C. Cir. 1993)), the court concluded that Kartseva had pled sufficient facts to survive a motion to dismiss, and that the district court on remand should "determine if State made a binding determination to disqualify Kartseva from any future contracts other than the particular State contract with Statistica on which [she] was working."  <u>Id.</u> at 1528.  If so, Kartseva's due-process claim would survive.  <u>Id.</u>

The posture of Plaintiff's claim here – at least regarding OPM – is highly analogous.  Even though that agency took "no <u>official</u> debarment action (that is, action under the published rules governing public contracting) against" Liff and his company, <u>see id.</u>, the Complaint includes statements from OPM's director indicating that Plaintiffs were *de facto* debarred or

suspended from contracting with OPM.  See Compl., ¶ 54.  "*De facto* debarment occurs when a contractor has, for all practical purposes, been suspended or blacklisted from working with a government agency without due process, namely, adequate notice and a meaningful hearing." Phillips v. Mabus, 894 F. Supp. 2d 71, 81 (D.D.C. 2012).  A plaintiff may establish a *de facto* debarment in two ways: "'1) by an agency's statement that it will not award the contractor future contracts; or 2) by an agency's conduct demonstrating that it will not award the contractor future contracts.'"  Id. (quoting TLT Constr. Corp. v. United States, 50 Fed. Cl. 212, 215-16 (2001)).

OPM's actions – including Berry's 2011 press conference and his 2013 memorandum response to the OPM investigation – provide some evidence of both.  Berry's allegedly unequivocal statement, for instance, that Plaintiffs "would not be used again by OPM for consulting services," Compl. ¶ 50, is a crystal-clear "agency[] statement that it will not award the contractor future contracts."  Mabus, 894 F. Supp. 2d at 81.  The 2013 memorandum reinforces this point: Berry's statement that he "took steps" in July 2011 to "immediately conclude[] any business involving" Plaintiffs suggests not only that OPM canceled any existing work but would also cease future business interactions with them.  See Compl., ¶ 50.  What steps Berry and OPM in fact took are, at present, unclear.  But at a minimum, OPM undeniably acted on this promise by terminating an outstanding task order under which Liff was to earn over $175,000 in contract payments.  See OPM Interim Investigative Report of April 2, 2013, at 28 (stating that "OPM exercised its right to terminate [a contract with Information Experts for $331,248] in August 2011," under which Liff was budgeted to receive $176,799), available at https://www.opm.gov/our-inspector-general/reports/2013/interim-investigative-report-improper-contracting-and-procurement-practices-utilized-to-circumvent-the-competitive-bid-process.pdf.

These actions suffice to nudge Plaintiffs' *de facto* debarment claim "across the line from conceivable to plausible." Twombly, 550 U.S. at 570; see Myers & Myers, Inc. v. U.S. Postal Service, 527 F.2d 1252, 1258 (D.C. Cir. 1975) (reversing district court's dismissal of contractor's claim that Postal Service "refus[ed] to renew" its contract without adequate procedural protections where plaintiffs plausibly alleged that non-renewal was "part of a 'sanction' taken against them for claimed irregularities in [its] operating procedures"); Mabus, 894 F. Supp. 2d at 81 (concluding that plaintiff subcontractor survived motion to dismiss where it alleged Navy "pulled back" $700,000 that had been allocated to its subcontract under a prime contract, announced its intention not to award plaintiff any more work under that contract, and sent internal emails indicating that plaintiff would not get any funding in the future under two specific contracting vehicles); Leslie & Elliott Co. v. Garrett, 732 F. Supp. 191, 196 (D.D.C. 1990) ("While the Navy may well have been justified in seeking to avoid further contracts with the plaintiff, that is not the issue.  Once the Navy has determined that it should no longer do business with the plaintiff, fair play and due process dictates that the Navy follow its debarment procedures," including notice and a hearing.).

### b.  DOL and DOL-OIG

Plaintiffs' claims against DOL and DOL-OIG rest on a more slender reed, but they, too, survive the government's Motion.  Because the Complaint sets forth no facts that would satisfy the first prong of Kartseva's status-change inquiry as to those activities – *i.e.*, a binding, even if informal, disqualification from agency contracting – Plaintiffs must rely on the second Kartseva prong, under which they must show that the government broadly precluded them from pursuing their "chosen career."  37 F.3d at 1528; see id. at 1529 (court must consider whether government defendant's actions "interfere[d] with [plaintiff's] constitutionally protected 'right to follow a chosen trade or profession'") (quoting Cafeteria Workers v. McElroy, 367 U.S. 886, 895-96

(1961)).  "The key inquiry . . . is this: Has the government, by attacking personal or corporate reputation, achieved in substance an alteration of status that, if accomplished through formal means, would constitute a deprivation of liberty?"  <u>Trifax Corp. v. District of Columbia</u>, 314 F.3d 641, 644 (D.C. Cir. 2003).  Only if Plaintiffs can prove that a government agency "has seriously affected, if not destroyed, [their] ability to obtain employment [or contracts] in [their] field" will they succeed in showing a "broad preclusion" from their chosen profession.  <u>Id.</u> (quotation marks and citations omitted, brackets in original); <u>see also</u> <u>Alexis v. Dist. of Columbia</u>, 44 F. Supp. 2d 331, 341 (D.D.C. 1999) (plaintiff "must demonstrate an injurious impact . . . beyond a disadvantage or impediment") (quotation marks and citation omitted).

In attempting to make this showing, Plaintiffs marshal two key facts.  First, they allege that Liff and his company have suffered a near-total loss of revenue, which they attribute to the DOL-OIG report and DOL's "ratification" of the report in its responsive memorandum.  <u>See</u> Compl, ¶ 54.  According to Plaintiffs, Liff "was on track to earn more than $300,000 by [the end of 2011], almost all of which was generated by government contracts[,] . . . [but that by] the end of 2013, that amount had plummeted to about $10,000 per year, a 97 % decrease."  <u>Id.</u>  In addition, Liff's "attempt[s] since July 2011 to 're-brand' himself as a human resources expert for private companies" have been met with little success.  <u>Id.</u>, ¶ 55.  Second, Plaintiffs allege with less specificity that they have "submitted competitive bids on a variety of government contracts since the issuance of the DOL-OIG report, but with one exception, ha[ve] not been selected for any project."  <u>Id.</u>, ¶ 52.  In a similar vein, prime contractors that had previously "expressed strong interest in teaming up with Liff later refused to partner with him because of the adverse publicity from the DOL-OIG report."  <u>Id.</u>

Although Plaintiffs have neither indicated how many "competitive bids" they submitted nor stated which agencies rejected those bids, the allegations taken together state a plausible claim that both DOL-OIG, by generating the report, and DOL, by publicly agreeing with its contents, have "effectively put [Plaintiffs] out of business," Old Dominion Dairy Prods., Inc. v. Sec'y of Def., 631 F.2d 953, 963 (D.C. Cir. 1980), by limiting their "ability to obtain . . . contracts" in the field of human-resources management.  See Trifax Corp., 314 F.3d at 644.

Significantly, Defendants have not argued that the DOL-OIG Report and the DOL memorandum have had no effect on the government's subsequent procurement decisions relating to Liff and his company.  In Kartseva, this precise type of uncertainty led the court to conclude that further factual development was appropriate in part to clarify "the extent to which [the government's] action as to Kartseva would normally be available to and would legally affect other government agencies or private employers in their decisions whether to employ her or permit her to work on government contracts."  37 F.3d at 1530 (emphasis added).

Such uncertainty similarly shadows the record here.  As an example: Part 9 of the Federal Acquisition Regulation (FAR) requires contracting officers, as a prerequisite to award, to make a "responsibility" determination, which includes making an affirmative finding that the contractor has "a satisfactory record of integrity and business ethics."  48 C.F.R. §§ 9.103(b), 9.104-1(d). The rules explain that, in making such findings, the "contracting officer should use" information from "sources such as publications . . . [and] Government agencies."  § 9.105-1(c)(5) (emphasis added).  These rules tend to suggest that the government must, or at least should, consider documents such as the DOL-OIG Report or other official communications like the DOL memorandum in making responsibility determinations.  In addition, the FAR also explains the common-sense principle that prime contractors must also ensure that their subcontractors meet

the same standards for business ethics and integrity.  See § 9.104-4.  With no additional

information from the government at this stage about how the communications at issue here

would factor into the "responsibility determination" process – or on other steps bearing on the

government's decisions to contract – the Court cannot definitively say that they would have no

effect on Plaintiffs' ability to find future government-contracting work.  Accord Old Dominion

Dairy, 631 F.2d at 966 & n.24 (concluding that contracting officer's disparaging responsibility

determination of prospective contractor was sufficient to implicate liberty interest, particularly

where "the determination that Old Dominion lacked integrity had already been communicated

through Government channels and would undoubtedly have been recommunicated every time [it]

bid on a subsequent contract").

Admittedly, on summary judgment, Plaintiffs' evidence will be put to the test.  It may be

that their allegations of lost opportunities are simply histrionic, or that, even if the government

could have relied on the challenged documents in denying work to Liff and his company, it did

not do so in any of the procurement decisions cited in the Complaint.  See Trifax Corp., 314 F.3d

at 644 (concluding on summary judgment that, where "the record demonstrates that [the

contractor] 'won some and lost some' in retaining and bidding on government contracts after [a

critical] OIG Report was released," the plaintiff "failed to show anything remotely close to

'broad preclusion'" from government contracting) (quoting Trifax Corp. v. Dist. Of Columbia,

No. 98-2824, ECF No. 166, Mem. Op. at 14 (D.D.C. Nov. 2, 2001)).  But those are questions for

another day.

B.  Count II (Bivens Claim for Damages)

Pointing to the same actions that undergird their due-process claim against the agency

Defendants, Plaintiffs also seek damages from three senior officials – Berry from OPM, Harris

from DOL, and Petrole from DOL-OIG – and two unknown DOL-OIG investigators, all in their individual capacities.  Plaintiffs thus invoke <u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971), which "established that the victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right."  <u>Carlson v. Green</u>, 446 U.S. 14, 18 (1980).

The individual Defendants seek dismissal on three bases: an expired statute of limitations, the absence of a <u>Bivens</u> remedy for the claimed injury, and qualified immunity.  <u>See</u> Mot. 16-27.  The Court will address each in turn, concluding that the <u>Bivens</u> claim may proceed at this stage against Berry, Harris, and Petrole, but not against the two unnamed officers from DOL-OIG.

### 1. *Statute of Limitations*

Defendants first contend that the <u>Bivens</u> action is untimely because it falls within the District of Columbia's one-year statute of limitations governing defamation actions.  <u>See</u> Mot. at 16 (citing D.C. Code § 12-301(4)).  Plaintiffs respond that this is not the operable statute.  <u>See</u> Opp. at 24-25.

"As is often the case in federal civil law, there is no federal statute of limitations expressly applicable to" a given claim.  <u>See</u> <u>DelCostello v. Int'l Bhd. of Teamsters</u>, 462 U.S. 151, 158 (1983).  To fill the gap, courts generally "'borrow' the most suitable statute or other rule of timeliness from some other source," which typically is "the most closely analogous" state-law timeliness rule.  <u>Id.</u>  Such "borrowing" is appropriate whether the civil remedy was crafted by the legislature or, as in a <u>Bivens</u> action, implied directly from the Constitution.  <u>See</u>

<u>Doe v. U.S. Dep't of Justice</u>, 753 F.2d 1092, 1114 (D.C. Cir. 1985) (applying state-law

borrowing to <u>Bivens</u> claim).

Defendants argue that Count II must be dismissed because all of the critical actions – *i.e.*,

Petrole's publication of the DOL-OIG report in July 2011, Harris's publication of the DOL

memorandum in August 2011, and Berry's release of his April 2013 letter – occurred over a year

before Plaintiffs filed suit in July 2014.  <u>See</u> Mot. at 16-17.  One year is appropriate, they argue,

because the D.C. Circuit in <u>Doe</u> held that the District's one-year limitation period governing

defamation suits was "most analogous" to a <u>Bivens</u> claim that the government had "depriv[d]

[plaintiff] of a constitutionally protected liberty interest in reputation without due process."  753

F.2d at 1105, 1111, 1114.  The court reached that conclusion in part because it concluded that

"damage to reputation . . . is central to the [plaintiff's] claim" – and thus defamation appears the

most closely analogous state-law tort – and also because she sought a "traditional damages

remedy to which she would be entitled in a common law defamation action."  <u>Id.</u> at 1114.

Four years after <u>Doe</u>, the Supreme Court in <u>Owens v. Okure</u>, 488 U.S. 235 (1989), sought

to remedy an inconsistency problem that had arisen in lower courts' application of the

"borrowing" rule in a related context: actions under 42 U.S.C. § 1983 for deprivations of

constitutional rights by state actors.  In <u>Owens</u>, the Court noted:

> Some courts found analogies in common-law tort, others in contract
> law, and still others in statutory law.  Often the result had less to do
> with the general nature of § 1983 relief than with counsel's artful
> pleading . . . .  Consequently, plaintiffs and defendants often had no
> idea whether a federal civil rights claim was barred until a court
> ruled on their case.  Predictability, a primary goal of statutes of
> limitations, was thereby frustrated.

<u>Id.</u> at 240 (footnote omitted).  Part of the confusion, the Court noted, was that constitutional tort

claims "have no precise state-law analog."  <u>Id.</u> at 249.  As a result, certain analogies to state-law

causes of action, like intentional torts, were "particularly inapposite" given the "wide spectrum

of claims which § 1983 has come to span." Id.  To remedy the pervasive inconsistencies in such actions, the Court held that, "where state law provides multiple statutes of limitations for personal injury actions, courts considering § 1983 claims should borrow the general or residual statute for personal injury actions."  Id. at 249-50.

Appealing to Owens, Plaintiffs argue that the District's residual statute of limitations, which provides a three-year period, must apply here, notwithstanding the D.C. Circuit's decision four years earlier in Doe.  See Opp. at 25 (citing D.C. Code § 12-301(8)).  Although Plaintiffs do not make the point directly, it follows from their position that they believe Doe has been overruled.  That argument has some appeal.  Doe itself relied on the near indistinguishability of Bivens and § 1983 actions in concluding that Carey v. Piphus, 435 U.S. 247 (1978) – a case concerning damages principles in § 1983 actions – applied with equal force to Bivens claims. See Doe, 697 F.2d at 1123 ("By its terms, Carey explicitly governs only suits brought under . . . § 1983.  But it would be difficult to defend a refusal to extend the holding of the case to . . . Bivens actions.  The bodies of law relating to the two forms of litigation have been assimilated in most other respects."); accord Williams v. Hill, 74 F.3d 1339 (D.C. Cir. 1996).

At the same time, although the D.C. Circuit ineluctably concluded that, under Owens, § 1983 claims must be governed by the District's three-year limitations period, see Earle v. D.C., 707 F.3d 299, 305 (D.C. Cir. 2012), the court expressly declined to consider Owens's applicability to federal Bivens claims.  See id. at 303 n.3 ("The federal defendants are not before us and so we treat only [the] section 1983 claim.").  Neither party has expressly addressed whether Doe remains good law.  Without the benefit of more thorough briefing on this point, and recognizing that the law appears sufficiently unsettled, the Court is unwilling to conclude that the action is plainly time barred.  See Doe, 753 F.2d at 1115 (court may dismiss claim as time barred

only "when it appears from the face of the complaint that the relevant statute of limitations bars the action"). Defendants, of course, may raise the issue again in a motion for summary judgment.

### 2. *Absence of <u>Bivens</u> Remedy*

Defendants next contend that the Supreme Court has "declined to adopt a <u>Bivens</u> remedy for reputational harm," and that damages are thus unavailable to Plaintiffs here. <u>See</u> Mot. at 17 (citing <u>Siegert v. Gilley</u>, 500 U.S. 226 (1991)). Undeniably, neither the Supreme Court nor the D.C. Circuit has affirmatively recognized a <u>Bivens</u> remedy for "reputational harm." But Defendants are wrong to claim that the Supreme Court has expressly declined a damages remedy for such a claim. Instead, the Court in <u>Siegert</u> reiterated the well-established rule that governmental defamation, standing alone, does not create a liberty interest safeguarded by the Fifth Amendment. <u>See</u> 500 U.S. at 233-34. It thus had no occasion to consider whether, assuming the plaintiff <u>had</u> pled a protected liberty interest, he would have recourse to a damages remedy under <u>Bivens</u>. Its dictum, therefore, that "damage[s] . . . may be recoverable under state tort law but . . . not . . . in a <u>Bivens</u> action" is merely a descriptive statement of the outcome in that case and carries no weight in deciding the issue before the Court here. <u>Id.</u> at 234.

Be that as it may, there is similarly no precedent in the Supreme Court or this Circuit holding that procedural due-process violations necessarily permit a damages remedy. <u>But see, e.g.</u>, <u>Arar v. Ashcroft</u>, 585 F.3d 559, 597 (2d Cir. 2009) ("A deprivation of procedural due process rights can give rise to a <u>Bivens</u> claim under our case law."). And, since the time of its decision in <u>Bivens</u>, the Supreme Court "has proceeded cautiously in implying additional federal causes of action for money damages." <u>Meshal v. Higgenbotham</u>, 804 F.3d 417, 421 (D.C. Cir. 2015). Defendants are thus correct to argue that a damages remedy may not be warranted here.

Whether that is so, however, need not be decided at this point.  As the Court made clear in Section III.A, *supra*, Plaintiffs have made out a plausible due-process claim – one that, upon further factfinding, may or may not vanish into the ether.  It thus appears both ill advised and premature to pronounce on the availability of a <u>Bivens</u> remedy before deciding the threshold question of whether a due-process violation has transpired.  This issue, too, must await subsequent resolution.

### 3.  *Qualified Immunity*

Defendants also move to dismiss on grounds of qualified immunity, which "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).  The doctrine "gives government officials breathing room to make reasonable but mistaken judgments" and "protects 'all but the plainly incompetent or those who knowingly violate the law.'"  <u>Ashcroft v. al-Kidd</u>, 131 S. Ct. 2074, 2085 (2011) (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986)).

In determining whether an official is protected by qualified immunity, "the Court must consider [1] whether the facts, viewed in the light most favorable to the plaintiff, establish a violation of a constitutional right and, if so, [2] whether that right was clearly established at the time of the alleged violation."  <u>Mpoy v. Fenty</u>, 901 F. Supp. 2d 144, 157 (D.D.C. 2012) (citing <u>Pearson</u>, 555 U.S. at 232).  "The Court has the discretion to decide 'which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'"  <u>Id.</u> at 158 (quoting <u>Pearson</u>, 555 U.S. at 236).  It addresses both below.

*i.* Violation of a Constitutional Right

The Court has already concluded that Plaintiffs at this stage have adequately pled a violation of due process by the agency Defendants. But the qualified-immunity question is more specific: have Plaintiffs' allegations also established that "each Government-official defendant, through the official's own individual actions, has violated the Constitution"? Iqbal, 556 U.S. at 676. The Court concludes that their allegations suffice as to the three senior officers named in the Complaint – Berry, Petrole, and Harris – but not as to the two unnamed agents.

Defendant Berry is most straightforward: the Complaint alleges that he expressly forbade OPM from contracting with Plaintiffs and that he "had taken steps" to conclude any existing business with them. See Compl., ¶ 50. Defendants nonetheless counter that "Berry is not even alleged to have made any false statements about Liff." Mot. at 26. Even assuming that is so, a false statement is not a necessary element of a *de facto* debarment claim, and thus its absence will not raise the shield of qualified immunity. See Mabus, 894 F. Supp. 2d at 82 ("[C]ategorical statements that contractors will not be awarded any future contracts may amount to a *de facto* debarment."); Kartseva, 37 F.3d at 1528.

Plaintiffs have similarly alleged that individual actions taken by Harris and Petrole had the broad effect of precluding them from government contracting. That is enough under Kartseva and its successors to state a plausible due-process violation, which requires only that a government actor's "'charges that the contractor lacks honesty or integrity'" have "'the broad effect of largely precluding [it]'" from its chosen field of government contracting. Trifax Corp., 314 F.3d at 644 (quoting Old Dominion Dairy, 631 F.2d at 955-56, and Kartseva, 37 F.3d at 1528, respectively). Contrary to what Defendants claim, the "broad preclusion" standard has never required a government defendant to himself take additional steps, beyond his derogatory speech, to carry out that preclusion. See Old Dominion Dairy, 631 F.2d at 955-56 ("[W]e hold

that when the Government effectively bars a contractor from virtually all Government work due to charges that the contractor lacks honesty or integrity, due process requires that the contractor be given notice . . . and some opportunity to respond to the charges before adverse action is taken."). Plaintiffs' claim that they were "effectively put . . . out of business" by Petrole's public release of the DOL-OIG report, Harris's memorandum response, and Harris's press-conference statements suffices at this stage to deny them both qualified immunity. See id. at 963.

The Complaint fails, however, to adequately plead that the "Two Unknown Agents of DOL-OIG" who allegedly "interviewed Liff on or about March 22, 2011 in connection with a DOL-OIG investigation" violated Plaintiffs' constitutional rights. See Compl., ¶ 6. The only allegation made against these two individuals is that they interviewed him in connection with the DOL-OIG investigation without "appris[ing Liff] of the false and vindictive accusations" lodged against him, id., ¶ 35, thereby depriving him of a "meaningful opportunity to address and be heard regarding [the] same." Id., ¶ 78. But the mere fact that the interview "resulted in an official report," id., ¶ 79 (note the passive voice), which, due to actions outside those agents' control, might have ultimately resulted in depriving Plaintiffs of protected liberty interests is insufficient to state a claim for damages. Plaintiffs seeking a Bivens remedy must "plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Iqbal, 556 U.S. at 676 (emphasis added). The allegations against the two unknown agents fail to meet that standard, and the claims against them will be dismissed.

*ii.* Clearly Established Right

The Court must also consider whether the due-process right asserted here was clearly established at the time of the alleged violation. See Pearson, 555 U.S. at 232. To reject an official's claim of qualified immunity, "the unlawfulness" of his action must be apparent "in the light of pre-existing law." Atherton v. Dist. of Columbia Office of Mayor, 567 F.3d 672, 689-90

(D.C. Cir. 2009) (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987)) (quotation marks

omitted).  If the "contours of the constitutional right that [Defendants] are accused of violating"

are not "'sufficiently clear that a reasonable official would understand that what he is doing

violates that right,'" <u>Navab-Safavi v. Glassman</u>, 637 F.3d 311, 317 (D.C. Cir. 2011) (quoting

<u>Anderson</u>, 483 U.S. at 640), a government officer is "entitle[d] not to be forced to litigate the

consequences of [his] official conduct."  <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 527 (1985).

 In pleading qualified immunity, Defendants argue primarily that "Liff has not alleged the

deprivation of a clearly established constitutional right" because "the Complaint at best raises a

garden-variety tort claim for defamation, not a violation of the Constitution."  Mot. at 23-24.

This argument misses the mark, as it simply rehashes the unsuccessful defense to Plaintiffs'

constitutional claim.  As a result – and to their detriment – Defendants spend most of their time

arguing that Plaintiffs do not plead a viable constitutional claim, rather than contending that the

rights asserted are not clearly established.

 Even if they had taken the latter position, however, freedom from a *de facto* debarment is

a clearly established right under D.C. Circuit precedent.  <u>See</u> <u>Wilson v. Layne</u>, 526 U.S. 603, 617

(1999) (qualified-immunity analysis looks to "cases of controlling authority in [the relevant]

jurisdiction at the time of the incident").  As discussed in Part III.A.2, *supra*, the D.C. Circuit in

1994 offered two specific scenarios in which a government contractor suffers a deprivation of its

liberty interest: through formal exclusion or through broad preclusion from government

contracting.  <u>Kartseva</u>, 37 F.3d at 1527.  The necessary elements of such a constitutional

violation have thus been in place for well over twenty years, if not longer, as much of <u>Kartseva</u>'s

reasoning rested on the Circuit's 1980 opinion in <u>Old Dominion Dairy</u>, 631 F.2d at 961 n.17 &

963-94.  Subsequent opinions have offered numerous applications of those principles in varying

contexts such that "'the contours of the right'" to enjoy adequate process before suffering *de facto* debarment "'are clear.'"  Dukore v. Dist. of Columbia, 799 F.3d 1137, 1144 (D.C. Cir. 2015) (quoting Reichle v. Howards, 132 S. Ct. 2088, 2094 (2012)); see also, e.g., Commercial Drapery Contractors, Inc. v. United States, 133 F.3d 1, 6 (D.C. Cir. 1998) ("An agency may not impose even a temporary suspension without providing the 'core requirements' of due process: adequate notice and a meaningful hearing."); Taylor v. Resolution Trust Corp., 56 F.3d 1497, 1506 (D.C. Cir. 1995) ("[G]overnment action precluding a litigant from future employment opportunities will infringe upon his constitutionally protected liberty interests only when that preclusion is either sufficiently formal or sufficiently broad.").  Plaintiffs' asserted due-process right is thus sufficiently clear to deny qualified immunity to Petrole, Harris, and Berry.

   C.   Count III (Administrative Procedure Act)

   In their final count, Plaintiffs allege that the three agency Defendants violated the Administrative Procedure Act.  They argue that (1) the DOL-OIG Report and DOL memorandum were "arbitrary and capricious" and "have resulted in, and/or substantially contributed to[] a constructive or *de facto* debarment" in violation of the Fifth Amendment; and (2) OPM's termination of Information Experts' outstanding task order was also "arbitrary and capricious" and violated Plaintiffs' "property interest" in his subcontract, also in violation of the Fifth Amendment.  See Compl., ¶¶ 88-92.

   The APA allows plaintiffs to challenge "[a]gency action made reviewable by statute" and "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Asserting that no statute other than the APA makes reviewable any of the challenged agencies' actions here, Plaintiffs insist that the DOL-OIG Report, the DOL memorandum, and OPM's decision to terminate the task order are all final agency actions under § 704, permitting review

under the APA's "'generic cause of action in favor of persons aggrieved by agency action.'"

Trudeau, 456 F.3d at 188 (quoting Md. Dep't of Human Res. v. Dep't Health & Human Servs., 763 F.2d 1441, 1445 n.1 (D.C. Cir. 1985)).

Whether or not that is so, the problem for Plaintiffs is that the only articulated basis for their APA grievance is that the relevant agency actions "resulted in, and/or substantially contributed to, a constructive or *de facto* debarment of Plaintiffs from government consulting opportunities . . . [which] violated Liff's liberty interest in pursuing his chosen profession . . . under the Due Process Clause of the Fifth Amendment." Compl., ¶ 92 (emphasis added). But that is precisely the focus of Count I, and the Court can discern no difference in either applicable legal standards or available remedies that would render a parallel APA challenge non-duplicative.

A close reading of the Complaint's prayer for relief makes this quite clear. The remedies stated therein are easily categorized into three types. First is the claim for compensatory and punitive damages. Those would not be available under the APA, which only permits actions "seeking relief other than money damages." 5 U.S.C. § 702 (emphasis added). Second is injunctive relief aimed at removing the injurious material from the public domain. See Compl. at 35 (seeking removal of documents from government websites). Finally, Plaintiffs request that the Court force Defendants to proactively undo the harm caused by their actions by, for example, "issu[ing] a public retraction" of their report and memoranda, "deem[ing]" Liff "to be a responsible contractor with a satisfactory record of performance," providing a "name clearing hearing," and "pay[ing] for a public relations firm" to help Plaintiffs scrub the internet of any references to his misconduct relating to the challenged documents. Id. at 35-36.

In short, apart from the monetary damages just mentioned, Plaintiffs' remedial strategy is directed exclusively towards fixing prospectively whatever reputational harm was inflicted upon them by Defendants.  But all of these remedies are available under Count I, and Plaintiffs have identified no legal right beyond their Fifth Amendment due-process right that would enlarge the scope of Defendants' liability.  See 5 U.S.C § 704 (APA only permits judicial review of agency actions "for which there is no other adequate remedy in a court").  In fact, the only effect of bringing such a claim under the APA's generic cause of action would be to substantially narrow the scope of this Court's review to only those actions properly deemed "final" under § 704.  See Trudeau, 456 F.3d at 187 ("The problem with relying on the APA . . . is that § 704 limits causes of action under the APA to final agency action.") (internal citation and quotation marks omitted).

Having already upheld the facial sufficiency of Plaintiffs' due-process claim, the Court will dismiss their APA challenge as duplicative.  See Dobkin v. Johns Hopkins Univ., No. 93-2228, 1994 WL 146760, at *8 (D. Md. Jan. 25, 1994) (dismissing plaintiff's APA claim as duplicative of his due-process claim).

## IV.    Conclusion

For these reasons, the Court will grant in part and deny in part Defendants' Motion to Dismiss.  A separate Order so stating will issue this day.


/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge


Date:   January 8, 2016